**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN LATORIA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 12 C 1097** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff John Latoria brings this action under 42 U.S.C. § 405(g), seeking to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits under Title II of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Plaintiff subsequently filed a motion for summary judgment seeking reversal of the Administrative Law Judge's decision, and the Commissioner filed a motion for summary judgment seeking affirmance of the decision. After careful review of the parties' briefs and the record, the Court now grants Plaintiff's motion and remands the matter for further proceedings.

## PROCEDURAL HISTORY

Plaintiff applied for disability insurance benefits on November 30, 2009, alleging that he became disabled beginning on October 19, 2009 due to back problems and depression. (R. 18, 175). The Social Security Administration denied the application initially on May 7, 2010, and again on reconsideration on August 9, 2010. (R. 18). Pursuant to Plaintiff's timely request, Administrative Law Judge ("ALJ") Janice M.

Bruning held a hearing on May 3, 2011, where she heard testimony from Plaintiff, represented by counsel, Plaintiff's girlfriend, and a vocational expert. (R. 18, 39-69). On June 23, 2011, the ALJ found that Plaintiff, then 49 years old, is not disabled because he is capable of performing jobs that exist in significant numbers in the national economy. (R. 25). The Appeals Council denied Plaintiff's request for review on December 16, 2011. (R. 1-3).

Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. In his motion, Plaintiff advances three main grounds for reversal. First, he challenges the RFC determination, mainly because the ALJ did not identify any medical support for her conclusion that Plaintiff can perform simple three to four-step tasks despite moderate limitations of concentration, persistence, and pace. Second, Plaintiff asserts that the ALJ erred by concluding that the opinion of his treating physician, Dr. Oken, was not entitled to significant weight. Lastly, Plaintiff argues that the ALJ erred in assessing his credibility by improperly relying on his daily activities, selectively considering evidence of his pain, and failing to consider certain evidence.

## FACTUAL BACKGROUND

Plaintiff was born on November 30, 1961, and was 47 years old on the alleged disability onset date of October 19, 2009. (R. 24). He is able to communicate in English. (*Id.*). He has a high school education, completed about one year of college, and has vocational training in carpentry. (R. 24, 37). His past relevant work experience includes approximately 27 years as a printing cutter operator from 1970 to 1997, and subsequent short-term jobs as an ink technician from October 2007 to April 2008 and a hospital housekeeper from January to October 2009. (R. 38, 176).

2

**A.     Plaintiff's Medical History**

**1.     Back and Neck Pain in 2006 to 2008**

The record in this matter shows a history of back and neck pain.  The medical documentation begins in October 2006 when Plaintiff presented at the Stroger Hospital clinic complaining of lower back and right leg pain and left arm paresthesias.  (R. 260).  Dr. Terry Lichtor noted that Plaintiff "has undergone steroid injections in the lower lumbar spine with some temporary relief of his symptoms," and that on exam there is "some pain on neck movement, the patient ambulates well, there is pain on straight leg raising of the right leg to 60 degrees, the motor strength is good and there is some diminished pinprick over the medial aspect of the distal left arm." (*Id.*)  Dr. Lichtor noted that an MRI scan of the lumbar spine performed at another hospital "is fairly unremarkable" and indicated a "[p]lan for MRI of cervical spine." (*Id.*)

On December 21, 2006, Dr. Reynaldo Gotanco completed a Physical Residual Functional Capacity Assessment for the Illinois Bureau of Disability Determination Services ("DDS").  (R. 262-269).  Dr. Gotanco stated a primary diagnosis of Scheuermann disease and a secondary diagnosis of degenerative disc disease.  (R. 262).  He concluded that Plaintiff can occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk about 6 hours in an 8-hour work day, sit about 6 hours in an 8-hour work day, and has no limitations on his ability to push or pull.  (R. 263).  He found that Plaintiff is occasionally limited in climbing, and is frequently limited in balancing, stooping, kneeling, crouching, and crawling.  (R. 264).  Finally, he found that Plaintiff has no manipulative, visual, communicative, or environmental limitations.  (R. 265-266).

In September 2007, Plaintiff presented at Advocate Lutheran General Hospital complaining of low back pain radiating down to his right leg.  (R. 270).  A month later, in October 2007, he saw Dr. Steven Mardjetko complaining of pain, which worsened when sitting, "now radiating from his lower back to both of his legs, along the posterior buttocks and posterior hamstring area, and stopping at the knees."  (R. 275).  Dr. Mardjetko noted that a round of epidural steroid injections in fall 2006 "did give him some relief for about six to eight months."  (*Id.*)  On exam, Plaintiff's gait was normal and he had full range of motion "with some pain at the endpoints" and "some midline lumbar pain with palpation."  (*Id.*)  Lumbar spine and scoliosis x-rays taken that day showed "some cervical degenerative disk disease as well as multilevel lumbar degenerative disk disease with a 14-degree lumbar kyphosis" and "multiple Schmorl nodes[1] of the lumbar spine."  (*Id.*)  Dr. Mardjetko ordered an MRI of Plaintiff's lumbar spine and prescribed Valium.  (R. 275).  He noted that the MRI "shows multilevel severe degenerative disk disease or Schmorl nodes" and "no nerve compression."  (R. 274-275).  The doctor's diagnosis was lumbar degenerative disk disease and Scheuermann disease,[2] for which he recommended epidural steroid injections and home physical therapy.  (R. 274).  Several days later, Plaintiff complained to Dr. Mardjetko of "terrible back pain" and "severe pain and spasms," for which the doctor prescribed Valium and a

---

[1]        Schmorl's nodes are an "upward and downward protrusion (pushing into) of a spinal disk's soft tissue into the bony tissue of the adjacent vertebrae."  MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=14007 (viewed Feb. 4, 2013).  They "are common, especially with minor degeneration of the aging spine" and "usually cause no symptoms, but they reflect that 'wear and tear' of the spine has occurred over time."  *Id.*

[2]        Scheuermann's disease, or kyphosis, "is a curving of the spine that causes a bowing or rounding of the back, which leads to a hunchback or slouching posture."  PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002220/ (viewed Feb. 4, 2013).  It can be caused by degenerative diseases of the spine, such as disk degeneration.  *Id.*

small amount of Norco until Plaintiff was able to see Dr. Molnar at the comprehensive pain clinic.  (R. 273).

Plaintiff was seen at Advocate Lutheran for back and leg pain, as well as anxiety and irritability, on several occasions from January through April 2008.  (R. 297-324, 363-369).  On April 21, 2008, Plaintiff complained to Dr. Mardjetko of "pain going from his neck all the way down to his low back, into both of his legs," and stated that "it feels like the pain has been messing with his head."  (R. 365).  After being unable to identify the psychiatrist Plaintiff said he saw previously, Dr. Mardjetko referred him to the emergency room for evaluation of his pain and his mental health.  (*Id.*)  On April 28, 2008, Plaintiff told Dr. Mardjetko that he was having "terrible back pain, [and] that he could not take it anymore," and was not interested in continuing the injections or seeing a doctor at the pain management center.  (R. 363).  The next day, Plaintiff came in for a series of tests.  He had a normal thoracic spine MRI, while a CT scan of his thoracic and lumbar spine showed that "[m]ild degenerative disc changes are present from L2 to L5."  (R. 325-326).  A lumbar discogram supported the conclusion that "the L5/S1 level contributes to the patient's pain complex" (R. 329-330), and a CT exam of the lumbar spine showed "[m]ultilevel disc degeneration and disc bulging at the levels of L3/L4 through L5/S1 without evidence of disc herniation, significant central or neural foraminal stenosis" (R. 330-332).

### 2.    Spinal Fusion Surgery in 2008

In May 2008, Dr. Mardjetko performed a surgical procedure on Plaintiff described as an "L5 to S1 posterior spinal fusion with decompression and osteotomies at L5 and S1."  (R. 279, 292-293).  Plaintiff was discharged with a prescription for Norco for pain.

(R. 280). Approximately two weeks later, in June 2008, Dr. Mardjetko performed a follow-up procedure for "posterior stabilization of the L5-S1 segment" to address continued "severe lower extremity back pain, [and] severe lower extremity radicular back pain." (R. 294-296). At a follow-up visit in mid-September 2008, Dr. Mardjetko noted that Plaintiff says his pain "now averages about 3-4 on a scale of 10, and on its worst day may be as high as 6 on a scale of 10." (R. 357). He concluded, "I do not believe that there is much else we can do for him for now." (*Id.*)

On four occasions in September and October 2008, upon referral from the Glen Oaks Hospital emergency room, Plaintiff saw Dr. Pavel Hudoba at Nonsurgical Spine & Ortho Care complaining of lower back pain and left lower extremity pain. (R. 336-344). Plaintiff reported that "[a]fter the surgery he started physical therapy and his left lower extremity symptoms partially worsened" with no symptoms on the right side. (R. 336). He rated the intensity of his pain "between 4-8/10 during standing and walking, also sitting or lifting causes worsening of the symptoms." (*Id.*) He was taking Naprosyn and Valium when he first saw Dr. Hudoba. (*Id.*) Dr. Hudoba's impression was "[l]umbar discogenic pain pattern with mild radiculitis mainly on the left side," "[m]oderate/significant lumbar myofascial pain," and "[p]ossibly left C6 radiculitis per clinical exam, without significant clinical symptoms." (*Id.*) He advised a treatment plan of physical therapy, home exercise, use of "appropriate biomechanics during vocational and avocational activities," Baclofen alternating with Valium, and avoidance of "positions and activities that worsen or reproduce the symptoms," including "[e]xcessive resting." (*Id.*) At a follow-up visit two weeks later, Plaintiff "report[ed] that he is doing partially

better," but complained that "[i]ntensity of the symptoms is rated between 5-7/10 during variable activities." (R. 339).

During this time, Plaintiff also received counseling from Dr. Charles Lin of Stratford Family Physicians concerning his pain medication usage. (R. 535). Dr. Lin noted that Plaintiff "had multiple scripts from different doctors, with many ER visits for pain control," and concluded that he believes Plaintiff "has a pain medication addiction [and] [Plaintiff] believes it also." (*Id.*) He suggested a possible rehabilitation program and noted that Plaintiff said he will only get pain medication from Dr. Hudoba in the future. (*Id.*) To treat his anxiety, Dr. Lin continued to refill Plaintiff's prescriptions for Buspar and Zoloft through at least July 2010. (R. 501-505, 512-513, 518-519, 522-523, 529-534, 559-560, 622-623).

Approximately two weeks after that, in mid-October 2008, Plaintiff reported that "his lumbar symptoms somewhat worsened," and Dr. Hudoba presented the option of "diagnostic/therapeutic left sacro iliac joint injection and nerve blocks." (R. 341-342). At a follow-up visit less than two weeks later, Plaintiff had received the injection and nerve blocks, but reported "that his symptoms have partially improved for approximately 1 week, then gradually returned." (R. 343). He complained that "the cervical and thoracic symptoms became significant, reaching intensity 10/10" and he was taking Vicodin for the pain (*Id.*) Dr. Hudoba advised obtaining an x-ray of the cervical spine and continuing home exercise and use of appropriate biomechanics. (R. 344).

In late October 2008, Dr. Mardjetko cleared Plaintiff to return to work "with a 20-pound lifting restriction, [which] may very well be indefinite for him." (R. 356). The doctor observed that Plaintiff's "symptoms have improved approximately 50 percent

overall," although "[h]e continues to have symptoms that are probably related to his proximal degenerative changes." (*Id.*) Plaintiff did not return to his ink technician job, but in January 2009 began a new job in housekeeping at Glen Oaks Hospital. (R. 176).

### 3.    Post-Surgery Treatment for Chronic Back and Neck Pain

On November 14, 2008, Dr. Virgilio Pilapil completed a second Physical Residual Functional Capacity Assessment for the DDS. (R. 345-352). Dr. Pilapil stated that the primary diagnosis is "status post L5-S1 fusion" and that Plaintiff alleges disability "due to lumbar injury / fusion." (R. 345, 352). Like Dr. Gotanco two years prior, Dr. Pilapil concluded that Plaintiff can occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk about 6 hours in an 8-hour work day, sit about 6 hours in an 8-hour work day, and has no limitations on his ability to push or pull. (R. 346). He found that Plaintiff is occasionally limited in climbing, balancing, stooping, kneeling, crouching, and crawling, and can do "no repetitive bending, twisting and no heavy lifting." (R. 347). Finally, he found that Plaintiff has no manipulative, visual, communicative, or environmental limitations. (R. 348-349). Dr. Pilapil observed that Plaintiff "appears partially credible, however the severity/duration of [his] subjective symptoms is disproportionate to the expected severity or duration of [his] medically determinable impairments in light of the treatment history, ADLs, and the objective evidence." (R. 350).

The records indicate that Plaintiff began seeing Dr. Jeffrey Oken at Marianjoy Medical Group in late November 2008 for management of his chronic pain. (R. 378-384). Plaintiff assessed his pain level as ranging between a 6 and an 8, and described it as located "down the small of his back, in his lower back, paraspinal as well as in the

8

superior aspect of his right gluteal as well as his entire left gluteal down to his toes." (R. 378). He characterized the pain as "stabbing, burning, pins-and-needles and numbness as well as aching." (*Id.*) Dr. Oken requested that Plaintiff be admitted to the chronic pain management program, ordered x-rays, and increased his Baclofen dosage. (R. 384). Although Plaintiff initially expressed his desire to go off narcotic pain medication (R. 380), by January 2009 he was taking Valium three times per day and Norco six times per day and stated they were "helping him very much," while he was "not sure" if the Baclofen was helping (R. 376). He also began taking Zoloft which he also found very helpful. (*Id.*) A cervical spine MRI that same month showed that "[a]t C5-C6, there is narrowing of the intervertebral disc space with moderate bulging of the disc osteophyte complex with mild mass effect upon the thecal sac and associated bilateral foraminal encroachment." (R. 396).

In January 2009, Dr. Oken referred Plaintiff to Elmhurst Memorial Hospital for further pain treatment, where he was prescribed Norco, Ultram, and Flexeril. (R. 405-415). He was seen at Elmhurst Hospital on three occasions in February, April, and May 2009, including continuing his narcotic medications and receiving Dilaudid injections for his pain. (R. 416-449). During this time, Plaintiff continued to see Dr. Oken, who reported in early February 2009 that Plaintiff "feels that his pain has improved in his lower back considerably" and then administered trigger point injections of lidocaine. (R. 497-498). Several weeks later, Plaintiff told Dr. Oken that "his back pain is under control and . . . his neck pain has gotten worse." (R. 495).

Plaintiff returned to Dr. Oken in mid-April 2009, complaining of pain that "ranges from 6 to 8 out of 10 in his low back with radiation posteriorly down his left leg." (R.

493).  Dr. Oken concluded that Plaintiff suffers from chronic pain and cervical and lumbar myofascial pain syndrome, and advised that Plaintiff continue using Norco and Valium.  (*Id.*)  Plaintiff returned two weeks later complaining of "a lot of pain in the center of his back" that "keeps him from doing his activities of daily living."  (R. 490).  Dr. Oken observed that Plaintiff has "limited active range of motion in the lumbar spine with flexion, extension, side bending to the right and left, and rotation to the right and left" as well as "limited active range of motion with abduction, adduction, internal rotation and external rotation of bilateral hip joints" and "with hip flexion and extension."  (R. 491).  Dr. Oken refilled Plaintiff's Norco and Valium prescriptions and prescribed a lumbar spine MRI.  (R. 491-492).

In July 2009, Plaintiff presented at Glen Oaks Hospital after he slipped and fell on a wet surface and cracked or bruised a rib, for which he received several Dilaudid injections and was prescribed Norco and rest.  (R. 387-388, 390).  One of the emergency reports notes that Plaintiff "is a known prescription narcotic addict."  (R. 386).  Plaintiff continued to complain of pain at follow-up visits to Dr. Oken in August and September 2009, and was advised to continue using Norco and Valium.  (R. 486-489).  In early September 2009, Plaintiff presented at Elmhurst Hospital where he reported decreased pain at a level of 6-7/10 and was prescribed no medications.  (R. 450-456).  At that time, Plaintiff also was evaluated by the hospital's Occupational Health Services, which noted his progress was "improved."  (R. 457-460).  Several weeks later, however, Plaintiff reported at Elmhurst Hospital complaining of pain and received Toradol and Dilaudid.  (R. 461-467).

In early October 2009, Plaintiff complained to Dr. Oken of pain at a level of 8 to 9/10. (R. 484). Upon examination, Dr. Oken noted lumbar range of motion to be 80 degrees toward flexion, 20 degrees extension, and 15 degrees lateral bending, but found Plaintiff "did have painful muscle band over the left lumbar paraspinals" and that "[p]assive extension of the left hip to about 15 degrees reproduce[s] [his] low back pain." (*Id.*) A supine straight leg raise test and Faber test were both negative bilaterally, and left hip internal/external rotation, flexion and extension were "nontender with excellent range of motion." (*Id.*) Dr. Oken refilled Plaintiff's Norco and Valium prescriptions, and noted that Plaintiff "appears to have a great outlook on his life, [and] is currently employed full time for environmental services at a hospital." (R. 485). Plaintiff subsequently returned to Elmhurst Hospital in mid-November 2009 and was prescribed Flexeril and Ultram. (R. 468-476).

Also in mid-November 2009, Plaintiff complained to Dr. Oken of a new problem with "left hand weakness and dropping things," for which he was referred to Dr. Strambosis at Elmhurst Hospital for "an EMG/NCS of the left upper extremity to evaluate his left hand weakness for ulnar nerve entrapment versus C8 radiculopathy." (R. 481-482). In late December 2009, Plaintiff saw Dr. Andrew Lueder at Marianjoy who noted that Plaintiff "stated that he continues to have pain in his neck as well as weakness in his hand," but did not undergo the recommended EMG and nerve conduction study "due to insurance problems." (R. 479). Dr. Lueder reported that Plaintiff's "systems were reviewed and all were negative except for . . . weakness as well as some neck pain and back pain." (*Id.*) The doctor noted that Plaintiff was taking Norco once or twice per day and Valium three times per day, and ordered his

prescriptions refilled, as well as advising Plaintiff to continue home exercise and "get an EMG and nerve conduction study of his left upper extremity as soon as possible." (R. 479-480).

Plaintiff returned to Marianjoy twice in mid-March and mid-April 2010, where he continued to receive Norco and Valium for his pain and muscle spasms. (R. 597-600). In mid-June 2010, he returned for Valium and Norco refills, which Dr. Oken gave him. (R. 591-592). Plaintiff told Dr. Oken that he was limited in walking, could sit for a maximum of one hour, and could stand for 10 minutes. (R. 591). Dr. Oken noted that "[i]l does not appear at this point in time he has any difference in his physical examination or his pain examination than he had previously[.]" (R. 592). He also wrote that Plaintiff "is applying for disability at this point in time. It does not appear that [Plaintiff] could, given his chronic neck pain as well as back pain, that he could be gainfully employed at this point." (*Id.*).

Plaintiff continued to complain of back, neck, and leg pain up until his hearing date, including a visit to Dr. Lin in July 2010 when he was unable to get into Marianjoy (R. 622-623), several visits to Dr. Chanda Mayo-Ford at Marianjoy in September and December 2010 and March 2011 (R. 613-620), and two visits to the Central DuPage Hospital emergency room in late December 2010 and mid-March 2011 (R. 602-611).

### 4. Psychiatric / Mental Evaluations

On May 3, 2010, Dr. Carl Hermsmeyer, PhD, completed an initial Psychiatric Review Technique for the DDS. (R. 562-575). He reviewed Plaintiff's medical records from Dr. Lin, Marianjoy, and Elmhurst Hospital, including Dr. Lin's psychiatric report to the DDC dated April 26, 2010, in which Dr. Lin noted that Plaintiff suffers from anxiety

12

and "poor ability" with calculations and math, but "does not believe that there are any serious limitations with the ability to perform tasks on a sustained basis." (R. 574, citing R. 553-556). Dr. Hermsmeyer concluded that Plaintiff suffers from anxiety that does not precisely satisfy the diagnostic criteria set forth under category 12.06 for anxiety-related disorders. (R. 567). He also found that Plaintiff has an impairment under category 12.09 for substance addiction disorders. (R. 570). Dr. Hermsmeyer found Plaintiff's functional limitations to be "mild" in terms of restriction of activities of daily living, and found his functional limitations to be "moderate" with respect to difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace. (R. 572). Dr. Hermsmeyer found no episodes of decompensation of extended duration. (*Id.*) He did not opine on the severity of Plaintiff's impairments, but rather checked the box indicating that Plaintiff's coexisting non-mental impairments required referral to another medical specialty. (R. 562).

On the same date, Dr. Hermsmeyer completed a Mental RFC Assessment for the DDS. (R. 576-579). He found Plaintiff to be moderately limited in his ability to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods. (R. 576). Dr. Hermsmeyer observed that Plaintiff "has a history of substance abuse with a diagnosis of anxiety" that "does not meet or equal any mental listing, but is more than non-severe." (R. 578). He concluded that "[a]lthough [Plaintiff] may have problems with understanding, remembering, and the ability to carry out detailed instructions, [he] retains the mental capacity to perform simple one- and two-step tasks at a consistent pace." (*Id.*)

**5.    2010 Physical RFC Assessment**

On May 4, 2010, Dr. Charles Kenney completed Plaintiff's third Physical RFC Assessment for the DDS.  (R. 580-587).  Dr. Kenney specified a primary diagnosis of "Lumbar Spinal fusion of L4-L5, L5-S1" and a secondary diagnosis of left shoulder pain.  (R. 580).  Like Dr. Gotanco in 2006 and Dr. Pilapil in 2008, Dr. Kenney concluded that Plaintiff can occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand and/or walk about 6 hours in an 8-hour work day, sit about 6 hours in an 8-hour work day, and has no limitations on his ability to push or pull.  (R. 581).  Dr. Kenney found that Plaintiff is occasionally limited in stooping and climbing ladders, ropes or scaffolds.  (R. 582).  Finally, he found that Plaintiff has no visual or communicative limitations, but that he is limited in his ability to reach in all directions and that he should avoid concentrated exposure to extreme cold.  (R. 583-584).  Dr. Kenney's conclusions were based on records of Plaintiff physical examinations by his treating physicians from July through December 2009.  (R. 581, 587).

On August 2-3, 2010, Dr. Vidya Madala and Dr. Terry A. Travis jointly completed a Request for Medical Advice for the DDS upon reconsideration.  (R. 593-595).  They noted that Plaintiff alleges spinal fusion, low blood pressure, leg and cervical problems, and depression.  (R. 593).  They stated that they reviewed the initial evidence and Dr. Kenney's RFC Assessment of May 4, 2010, as well as Dr. Hermsmeyer's Psychiatric Review Technique and Mental RFC Assessment of May 2, 2010.  (R. 594).  Dr. Madala and Dr. Travis affirmed those RFC determinations as written.  (R. 595).

**B.      Plaintiff's Testimony**

At the hearing before the ALJ on May 3, 2011, Plaintiff identified the location of his pain as his back, lower back, legs, left arm, and neck. (R. 39). He described the pain as "[a]ching, throbby; it's sharp, burning," and characterized it, on a scale from one to ten, as a "steady seven to eight every day" without pain medication. (*Id.*). Plaintiff testified he experiences side effects from the pain medication, such as "skin rash; very foggy head [,] . . . it's hard to think clearly on medicine, upsets my stomach." (R. 39-40). He completed a 21-day course of physical therapy at Marianjoy, but stated that he can no longer afford it so instead he stretches as instructed at home and tries to walk as much as possible. (R. 40). Plaintiff testified that he cannot afford to see a mental health specialist on a regular basis due to lack of insurance, but takes Zoloft for depression which he obtains through his primary care doctor. (R. 40, 50).

In terms of his recent work history, Plaintiff testified that he last worked as a housekeeper at Glen Oaks Hospital, but lost the job in October 2009 because he "wasn't performing up to their standards" as his condition worsened and he had difficulty walking. (R. 38, 48-49). In response to the ALJ's question about whether he had performed intermittent carpentry work as noted in a doctor's report, he testified that had had not done carpentry "in years," and that the person taking the statement made an error. (R. 38, 50). He stated that he hopes to take computer and cooking classes through a program offered by DuPage County. (R. 54-55). He said he attempted to attend school to become a CNA but was unable to complete the courses because he could not focus and the program required heavy lifting. (R. 44-45).

15

In terms of his functional capacity, Plaintiff testified that he can walk a half mile "[o]n a good day," but only has two or three good days per month. (R. 40-41, 51). He can stand for "probably 10 to 15 minutes" but can only sit for "30 seconds, maybe a little bit more, but not a whole lot." (R. 41). After 30 seconds, his "legs go numb" and he "start[s] getting the shooting pain," which requires him to "stand up and kind of just move around a little bit and then sit back down, ice packs, TENS unit." (R. 52). Due to his nerve and disc problems, he has "a hard time" with his arm and "can't feel" his dominant left hand. (*Id.*). When he writes, he "[has] to constantly stop . . . because . . . [his] hand's numb, and it looks like chicken scratch." (R. 54). He testified it had been "[t]his bad" for six to eight months but was "getting progressively worse." (R. 42).

As far as his daily activities, Plaintiff testified that he has "a hard time carrying milk and groceries" and difficulty climbing stairs, although he does so about once a day to get to and from his apartment. (*Id.*). He sleeps five to six hours of "broken sleep" per night due to discomfort, and has difficulty putting on his pants and socks and buttoning his shirt. (R. 43). He drives a couple blocks to the grocery store "maybe once a week" and "can cook small things" although usually his girlfriend prepares meals for him. (*Id.*). He can wash cups and light items, put laundry in the machine, vacuum "[v]ery little," and put a sheet on the bed but cannot "make it how [he] would like to." (R. 44). He cannot dust, mop, or sweep, and takes the garbage out "[v]ery rarely" because "pushing and pulling" causes pain in his back and neck and makes his "arms go numb." (R. 44, 53). He attends church, but has not been out to dinner "in a long, long time" because he "just can't sit." (R. 45). He reads frequently and watches television in a chair that "supports [his] back fairly well." (R. 45-46, 52).

Plaintiff testified about his use of various assistance devices and therapies. He uses a cane "[e]very time" he walks, although he left the cane in his car during the hearing because he "didn't know if [the guard would] let me in the door with it." (R. 42, 53). He uses a TENS unit every night for 30-45 minutes and ices his back daily "for a half hour on and roughly two hours off." (R. 57). He uses an Ace bandage wrap around his midsection for his lower back and stomach muscles. (R. 42, 57-58). In terms of pain medication, he takes eight Norco and three Valium per day. (R. 57).

Plaintiff said that after he obtains insurance, the pain management clinic wants to do a cervical x-ray to determine if therapy is feasible or if surgery is necessary. (R. 42-43). He testified that he owes Marionjoy "[r]oughly $40,000" and is waiting for a response to his application to its financial assistance program. (R. 55-56).

## C.    Girlfriend's Testimony

Sandra Ridgehide, Plaintiff's live-in girlfriend, also testified on his behalf. (R. 59-60). Ms. Ridgehide testified that she works as a medical records coder and has lived with Plaintiff since late 2007. (R. 60). Concerning Plaintiff's recent work history, she stated that Plaintiff "tried to work at the hospital," but that he "struggles with it, and he just needs to get continued therapy." (R. 61). She testified that "he hasn't done any carpentry work whatsoever." (R. 62). Ms. Ridgehide also testified that Plaintiff will be getting work training assistance through a DuPage County program. (R. 62-63).

## D.    Vocational Expert's Testimony

Aimee Mowery testified at the hearing as a vocational expert ("VE"). (R. 63). The VE identified Plaintiff's past relevant work as carpenter, shipping and receiving

clerk, pressman, and hospital cleaner, and observed that none of these jobs have skills that are transferable to sedentary work. (R. 64-65).

The ALJ then described a hypothetical individual of Plaintiff's age, education, and work experience who is able to lift and carry 10 pounds occasionally and less than 10 pounds frequently; can stand and/or walk a total of two hours and sit at least six hours during an eight-hour workday; can reach overhead with the right and left upper extremities; can never climb ladders, ropes or scaffolding; can occasionally climb ramps and stairs, balance, stoop, crouch, kneel, and crawl; should avoid concentrated exposure to work hazards and cold temperatures; and must have "a sit-stand option, meaning after sitting for 45 minutes be allowed to stand one to two minutes." (R. 65-66). The VE testified that such an individual could perform sedentary jobs available in the regional economy such as information clerk (3,012 jobs), order clerk (753 jobs), and interview clerk (750 jobs). (R. 66).

The ALJ then revised the hypothetical to assume the same factors and limitations reflected in the initial hypothetical, but adding the limitation that the individual needs a cane to walk. (R. 66). The VE testified that the limitation "would not impact those jobs since they're primarily sitting." (*Id.*) Next, the ALJ revised the hypothetical further to specify that the individual "is limited to unskilled, three- to four-step simple, repetitive, routine tasks and should come in only occasional contact with coworkers, supervisors, and the public for work-related purposes." (*Id.*). The VE testified that the three occupations she noted previously would be eliminated "due to the public contact and the simple steps," but that the individual could perform the jobs of hand packager (1,088 jobs), assembler (1,192 jobs), and sorter (398 jobs). (*Id.*). Finally, the VE testified that

18

there would be no jobs available if the individual is off-task 20 percent of the workday or is absent three days per month.  (R. 67).

**E.    ALJ's Decision**

In her written decision, the ALJ found that Plaintiff has not been disabled since the alleged onset date of October 19, 2009.  (R. 18).  In applying the five-step sequential analysis required by 20 C.F.R. § 404.1520(a), the ALJ first determined that Plaintiff has not engaged in substantial gainful activity since the onset date.  (R. 20).  At Step 2, she then determined that Plaintiff has the severe impairments of history of spinal surgery, anxiety and depression.  (*Id.*).  However, at Step 3, the ALJ determined that none of these impairments met or medically equaled any of the listed impairments identified in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 20-21).  Specifically, as to his physical impairment under Listing 1.04 for spinal disorders, the ALJ relied upon the findings of the state agency physicians in finding that Plaintiff "does not manifest clinical signs and findings that meet the specific criteria," given his "motor strength testing" and "ability to ambulate effectively."  (*Id.*)  As to his mental impairments, the ALJ found that Plaintiff has only mild restriction of daily living activities, moderate difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence, or pace, and that he has experienced no episodes of decompensation of extended duration.  (R. 21).

Proceeding to Step 4, the ALJ concluded that Plaintiff retains the residual functional capacity ("RFC") to perform "three to four-step simple, repetitive, routine unskilled sedentary work" except that he must avoid "concentrated exposure to cold temperature extremes or work hazards such as heights or moving machinery; more

than frequent overhead reaching with the upper extremities due to back pain; any ladder, rope, or scaffold climbing; work requiring more than occasional balancing, stooping, crouching, crawling or kneeling or more than occasional contact with the public, co-workers or supervisors" and that he must be "in a work environment permissive of alternating between sitting and standing positions, meaning after sitting for forty-five minutes be allowed to stand for one to two minutes." (R. 21-22). In reaching this determination, the ALJ considered Plaintiff's testimony and the medical records and opinion evidence. (R. 22-24). Based on this, the ALJ concluded that Plaintiff "can perform a variety of activities," including "household chores, drive occasionally, use public transportation and go shopping." (R. 23, 24). She found the record to be internally inconsistent, including a March 17, 2010 medical record in which Plaintiff complained of radiating back and neck pain, but affirmed that he can lift up to 25 pounds (R. 22); a June 21, 2010 progress note mentioning that Plaintiff is in pain while lying down and while sitting or standing for more than 10 minutes, yet affirming that he feels better with exercise, exercises daily, and can lift up to 50 pounds (R. 23); and a December 17, 2010 progress note documenting Plaintiff's complaint of neck and back pain but "fail[ing] to indicate that [Plaintiff] had any acute pathology." (R. 23).

In her credibility finding, the ALJ found Plaintiff "not persuasive." (R. 23). In addition to Plaintiff's complaints of pain being inconsistent with the record, the ALJ also found it significant that Plaintiff "was shoveling snow" in February 2011, reported to Marianjoy that "he did carpentry work as needed" in March 2011 and later contradicted himself at the hearing, takes computer classes despite claiming to have poor hand coordination, did not bring his cane to the hearing, and claims to be able to sit for only

30 seconds yet sat for 15 minutes at the hearing before his attorney suggested he stand. (R. 23, 24). The ALJ also found troubling his "special relationship with Marianjoy especially Dr. Oken" as evidenced by his appearance with Dr. Oken on the Marianjoy website and Dr. Oken's failure to address Plaintiff's narcotic addiction. (R. 23).

The ALJ then found that Plaintiff is unable to perform his past relevant work, but relying on the VE, concluded that there are other jobs that exist in sufficient numbers in the national economy that Plaintiff can perform, given his age, education, work experience, and RFC. (R. 24). Accordingly, the ALJ found that Plaintiff was not disabled since his alleged disability onset date. (R. 25).

## DISCUSSION

### A.    Disability Standard

A claimant who can establish he is "disabled" as defined by the Social Security Act, and was insured for benefits when her disability arose, is entitled to disability insurance benefits. 42 U.S.C. §§ 423(a)(1)(A), (E); *see also Liskowitz v. Astrue*, 559 F.3d 736, 739-40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382(a)(3)(A). An individual is under a disability if he is unable to do his previous work and cannot, considering his age, education, and work experience, engage in any gainful employment that exists in the national economy. *Id.* at § 423(d)(2)(A).

In order to determine whether a claimant is disabled, the ALJ conducts a standard five-step inquiry, set forth in 20 C.F.R. § 404.1520(a)(4), which requires the

ALJ to consider in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals one of a list of specific impairments enumerated in the regulations; (4) whether the claimant can perform his past relevant work; and (5) whether the claimant is able to perform other work in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001) (citations omitted). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Id.* (quoting *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985)); *see also* 20 C.F.R. § 404.1520(a)(4).

## B.     Standard of Review

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). A "court will reverse an ALJ's denial of disability benefits only if the decision is not supported by substantial evidence or is based on an error of law." *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). Evidence is considered substantial "so long as it is 'sufficient for a reasonable person to accept as adequate to support the decision.'" *Ketelboeter v. Astrue*, 550 F.3d 620, 624 (7th Cir. 2008) (quoting *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). The reviewing court may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if the ALJ does not "'build an accurate and logical bridge from the evidence to the

22

conclusion.'" *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)); *see also* 42 U.S.C. § 405(b)(1) (denial of benefits must contain a discussion of the evidence and a statement of the Commissioner's reasons).

## C.  Analysis

The Court now addresses Plaintiff's three arguments challenging the ALJ's decision as to the weight assigned to Dr. Oken's opinion, the RFC determination, and the credibility assessment.

### 1.  The Opinion of Treating Physician Dr. Oken

Plaintiff argues that the ALJ erred by failing to give significant weight to the opinion of Dr. Oken, Plaintiff's treating physician at Marianjoy Medical Group. Dr. Oken, a pain management specialist, treated Plaintiff for chronic back and neck pain after his spinal fusion surgery. Dr. Oken examined Plaintiff more than ten times over the course of approximately 20 months from late 2008 to mid-2010, including performing various musculoskeletal and neurological tests to assess Plaintiff's muscle strength, reflexes, coordination, range of motion, flexion, extension, and pain, as well as prescribing medication, therapies, and other treatment. (R. 378-384, 481-485, 490-492, 495-498, 591-592).

It is well-established that a treating physician's opinion is entitled to controlling weight if two conditions are met: (1) the opinion is "well-supported" by "medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion is "not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 416.927(d)(2); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Punzio v. Astrue*,

630 F.3d 704, 710 (7th Cir. 2011); *Schaaf v. Astrue*, 602 F.3d 869,  875 (7th Cir. 2010); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)*; Clifford*, 227 F.3d at 870.  If the opinion is contradicted by other evidence or is internally inconsistent, the ALJ may discount it so long as she provides an adequate explanation for doing so.  *Punzio*, 630 F.3d at 710; *Schaaf*, 602 F.3d at 875; *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).  The regulations specify that when an ALJ does not give controlling weight to a treating source's opinion, the ALJ will consider other factors to determine how much weight to give the opinion, namely (1) length of the treatment relationship and frequency of examinations, (2) nature and extent of the treatment relationship, (3) supportability of the opinion with evidence, particularly medical signs and laboratory findings, (4) consistency of the opinion with the record as a whole, (5) the source's area of specialty, and (6) other factors the claimant or others bring to the ALJ's attention.  *See* 20 C.F.R. § 416.927(d)(2)-(6).

As a preliminary matter, it is not entirely clear what "opinion" of Dr. Oken was not given significant weight since the ALJ's decision refers only to "the opinion set forth in Exhibit 22-F." (R. 23).  Exhibit 22-F contains two pages of typed treatment notes from Dr. Oken dated June 21, 2010, which include, among other things, Dr. Oken's assessment of the nature and severity of Plaintiff's impairments, his diagnosis of eight conditions, and his treatment plan.  (R. 591-592).  Although the ALJ does not specify to what portion of this document she declines to give significant weight, the parties have assumed it to be the following statement in Dr. Oken's treatment plan: "It does not appear that this patient could, given his chronic neck pain as well as back pain, that he could be gainfully employed at this point."  (R. 592).  Opinions concerning whether a

claimant is disabled or unable to work are not medical opinions, but rather are determinations reserved for the Commissioner. 20 C.F.R. § 404.1527(d). However, an ALJ must consider a treating physician's opinions concerning the nature and severity of a claimant's impairments, what he can still do despite those impairments, and his physical or mental restrictions. *Id.* at § 404.1527(a)(2). As discussed below, to the extent that the ALJ declined to give significant weight to Dr. Oken's opinion on these issues, the Court finds that this was improper.

As Plaintiff notes, the ALJ discounted Dr. Oken's opinion due to what she characterized as a "special relationship" between Plaintiff and Dr. Oken evidenced by their appearance together on the Marianjoy website. (R. 23). Based on this, the ALJ concluded that "their relationship is not only that of doctor/patient." (*Id.*) The ALJ then declined to give significant weight to Dr. Oken's opinion "given their relationship and that Dr. Oken did not address [Plaintiff's] problems with narcotic prescriptions" as identified in records from Glen Oaks Hospital and another Marianjoy doctor. (*Id.*) Plaintiff asserts that the ALJ's reliance on the website is improper because she "did not provide any explanation why, because a patient appears on a clinic's website, that this undermines the treating specialist's opinion" and because the ALJ failed to consider the factors set forth in the regulations before reaching her conclusion. (Doc. 16 at 18). The Court agrees with Plaintiff that the ALJ's decision not to give significant weight to Dr. Oken's opinion for these reasons and without more explanation was improper.

First, the ALJ does not explain the significance of Plaintiff's "appearance" with Dr. Oken on the Marianjoy website. One might infer that the ALJ viewed the appearance as some kind of promotional effort or endorsement of Dr. Oken or Marianjoy, and that the

ALJ presumably believed that this created an incentive for Dr. Oken to present Plaintiff's case more favorably than he otherwise would have. But the ALJ never said this, nor did she provide insight of any kind into the nature of Plaintiff's "appearance" on the website or her analysis of why it made Dr. Oken's opinion as a treating source less reliable.

In addition, the ALJ's other justification for giving little weight to Dr. Oken – that he failed to "address" Plaintiff's narcotic "problem" – is likewise lacking explanation or evidentiary support. The ALJ points to the fact that Dr. Chanda Mayo-Ford, another doctor at Marianjoy, identified Plaintiff's "problems with narcotic prescriptions." (R. 23, citing R. 620). But while Dr. Mayo-Ford, in her treatment note dated September 2, 2010, noted "'[c]hronic opioid use" among her impressions, her note did not explain the significance of this impression and she nonetheless proceeded to order Plaintiff's Valium and Norco prescriptions refilled at the same dosage ordered by Dr. Oken during Plaintiff's previous follow-up visit in June 2010. (R. 592, 620). There is nothing in Dr. Mayo-Ford's treatment note to suggest that Plaintiff's chronic opioid use was a "problem" that Dr. Oken had somehow failed to treat properly by reducing Plaintiff's dosage or declining to refill his prescriptions. Furthermore, there is no evidence in the record that Dr. Oken saw Plaintiff after Dr. Mayo-Ford noted the chronic opiate use on September 2, 2010. Nor is there evidence that Dr. Oken was aware that at various times Plaintiff received narcotic prescriptions from doctors other than those at Marianjoy.

The Commissioner argues that notwithstanding the ALJ's reliance on Plaintiff's website appearance and narcotic usage, the ALJ's decision to give Dr. Oken's opinion little weight is supported because the ALJ reasonably found Dr. Oken's opinion

inconsistent with other substantial evidence in the record, including Dr. Oken's own treatment notes. Consistency of the opinion with the record as a whole is one of the CFR factors to be considered, *see* 20 C.F.R. § 416.927(d)(4), and the ALJ identified numerous purported inconsistences that she found compelling. But only one of those purported inconsistencies involved Dr. Oken. Specifically, the ALJ identifies the June 21, 2010 progress note prepared by Dr. Oken which mentions that Plaintiff is in pain while lying down and while sitting or standing for more than 10 minutes, yet also notes that he feels better with exercise, exercises daily, and can lift up to 50 pounds (R. 23, citing R. 591). The ALJ fails to explain how this one progress note is sufficiently inconsistent with the substantial evidence in the record, given that Plaintiff's treating doctors instructed him to engage in home exercise and avoid excessive resting (R. 336, 344, 480), and given that the progress note does not specify what exercises he does and for how long and whether he can do so without pain. The ALJ also cites treatment notes dated March 17, 2010, December 17, 2010, and March 28, 2011 that she found to be internally inconsistent (R. 22), however the ALJ fails to mention that these notes were prepared by Dr. Mayo-Ford, not Dr. Oken, so they have no bearing on how much weight to give Dr. Oken's opinion. (R. 599-600, 613-616). The ALJ references other emergency room records that she found to be inconsistent, but again, these were prepared by medical sources other than Dr. Oken.

The one treatment note prepared by Dr. Oken that the ALJ found to be internally inconsistent becomes even less significant when viewed together with the other CFR factors that the ALJ did not address. For example, it weighs in favor of giving significant weight to Dr. Oken's opinion about the nature and severity of Plaintiff's impairments

given the nature and length of the treating relationship, namely that Dr. Oken examined and treated Plaintiff on 11 separate occasions from November 2008 to June 2010. *See* 20 C.F.R. § 416.927(d)(1),(2). It also weighs in favor of according Dr. Oken's opinions significant weight because they are supported by objective medical tests, including his reliance in June 2010 on Plaintiff's most recent cervical spine MRI, taken in January 2009, which showed "a moderate bulging and osteophyte complex at C5-6 [with] bilateral foraminal encroachment." (R. 592, citing R. 396). During that same June 2010 visit, Dr. Oken also performed a physical examination and tests which allowed him to conclude that Plaintiff shows "decreased range of motion of the cervical spine," "slight hand intrinsic weakness bilaterally at the 4-/5 level," normal upper extremity reflexes, lower extremity reflexes of 2/4, normal lower extremity strength, and "myofascial tenderness in the cervical paraspinal areas." (R. 591). Finally, it also weighs in favor of giving significant weight to Dr. Oken's opinion concerning the nature and severity of Plaintiff's pain and his resulting physical limitations given that Dr. Oken is the Medical Director of the Marianjoy Integrative Pain Treatment Center, is board-certified in pain medicine, and has specialized expertise in chronic pain management and myofascial pain syndrome.[3] *See* 20 C.F.R. § 416.927(d)(5). In light of the lack of record support for the ALJ's stated reasons for not giving significant weight to Dr. Oken's opinion, and the many factors that weigh in favor of according such weight which the ALJ failed to address, to the extent the ALJ did not give significant weight to Dr. Oken's opinion as to the nature and severity of Plaintiff's impairments and his physical capabilities and restrictions, the ALJ's determination is not supported by substantial evidence.

---

[3] *See* Marianjoy Rehabilitation Hospital, Integrative Pain Treatment Center Staff, http://www.marianjoy.org/pain/painprogramstaff.aspx (viewed Feb. 4, 2013).

**2.     The RFC Determination**

Plaintiff also challenges the ALJ's RFC finding on grounds which are essentially two sides of the same coin:  the ALJ's failure to consider Plaintiff's moderate limitations in concentration, persistence and pace, and the ALJ's lack of support for her determination that Plaintiff can perform simple three to four-step sedentary work with a sit/stand option.   The Commissioner argues generally that the ALJ adequately considered any mental limitations by restricting him to three or four-step tasks and sedentary work with a sit/stand option.  In order to determine at Steps 4 and 5 of the analysis whether the claimant can perform his past relevant work or adjust to other work, the ALJ must first assess the claimant's RFC, which is defined as the most the claimant can do despite his limitations.  *See* 20 C.F.R. §§ 404.1520(e), 404.1545; Social Security Ruling ("SSR") 96–8p, 1996 WL 374184, *2.  This requires an ALJ to consider all functional limitations and restrictions that stem from medically determinable impairments, including those that are not severe.  *See* SSR 96–8p, 1996 WL 374184, *5.  In doing so, an ALJ is not permitted to "play doctor" or make independent medical conclusions that are unsupported by medical evidence or authority in the record.  *Clifford*, 227 F.3d at 870; *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003).  An ALJ need not discuss every piece of evidence, but must logically connect the evidence to the ALJ's conclusions.  *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Berger*, 516 F.3d at 544.  As discussed below, the ALJ failed to connect the evidence to her RFC findings, and thus the RFC is not supported by substantial evidence.

In sum, the ALJ disregarded medical opinion evidence that Plaintiff is limited to one to two-step tasks, and replaced it with her own unsupported opinion that he can perform three to four-step tasks. At Step 3 of the analysis, the ALJ found that Plaintiff has moderate difficulties in maintaining concentration, persistence, or pace. This is consistent with the Psychiatric Review Technique and Mental RFC Assessment prepared by state agency psychologist Dr. Carl Hermsmeyer, the only medical source who assessed Plaintiff's mental RFC. (R. 21). In those assessments, Dr. Hermsmeyer concluded that Plaintiff has moderate functional limitations with respect to maintaining concentration, persistence, or pace. (R. 572, 576). Significantly, Dr. Hermsmeyer went on to expressly state in his Mental RFC Assessment: "Although [Plaintiff] may have problems with understanding, remembering, and the ability to carry out detailed instructions, [he] retains the mental capacity to perform *simple one- and two-step tasks* at a consistent pace." (R. 578) (emphasis added). No other medical source in the record opines on Plaintiff's ability to perform multi-step tasks. Yet at Step 4 the ALJ nonetheless fashioned an RFC which specifies that Plaintiff can perform three to four-step tasks and fails to cite any medical evidence that supports this finding.

The Commissioner argues simply that the ALJ is not bound by the Psychiatric Review Technique ("PRT") of Dr. Hermsmeyer because it applies only to the severity of impairments determination at Step 3, not the RFC determination at Step 4. (Doc. 18 at 6, citing SSR 96-8p). While this is correct, it misses the point by failing to acknowledge the Mental RFC Assessment that Dr. Hermsmeyer also prepared, and which explicitly concluded that Plaintiff's mental impairments limit him to performing simple one and two-steps tasks. (R. 576). As Social Security Ruling 96-8p specifies, while the PRT is

30

used at Step 3, the Mental RFC Assessment is used at Steps 4 and 5:

> *The psychiatric review technique.* The psychiatric review technique described in 20 CFR 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. *The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.*

SSR 96-8p, 1996 WL 374184, *4 (emphasis added). Thus, the ALJ was required to explain at Step 4 of her analysis why she elected to disregard Dr. Hermsmeyer's opinion in the Mental RFC Assessment that Plaintiff could perform only one to two-step tasks. In rejecting Dr. Hermsmeyer's opinion, the ALJ was required to identify the medical evidence upon which she based her contradictory conclusion that Plaintiff could perform three to four-step tasks. *See Scott v. Astrue*, 647 F.3d 734, 740-41 (7th Cir. 2011) (concluding that the ALJ erred in imposing without explanation a weight-lifting limitation that was contrary to medical evidence and claimant's testimony). Here, the ALJ failed to do so.

Not only did the ALJ entirely omit any mention of or citation to Dr. Hermsmeyer's opinion, she identified no treatment notes, objective test results from other physicians, or other medical evidence in the record that supports the ALJ's own less restrictive limitation on Plaintiff's ability to perform multi-step tasks. The entirety of the ALJ's

31

discussion of Plaintiff's mental impairments is as follows:

> Concerning claimant's psychological status, there is only one record of a doctor visit for psychiatric complaints since claimant's alleged onset date (see Exhibit 14-F at 3) and an April 26, 2010 treating physician's report indicates that claimant was assessed as fully capable of working (Exhibit 17-F).

(R. 23). As to the first item of evidence, Exhibit 14-F, this January 2010 progress note from family medicine treating physician Dr. Lin supports Plaintiff' mental limitations, indicating that the reason for the visit is "[f]ollow up anxiety" and observing that Plaintiff "is experiencing anxious, fearful thoughts, irritable mood, fatigue or loss of energy and restlessness or sluggishness." (R. 501). Dr. Lin assessed Plaintiff as suffering from anxiety that is "Chronic/Persistent" and continued to prescribe Zoloft. (R. 502). It was improper for the ALJ to disregard this evidence from Plaintiff's treating physician solely due to the purported absence of additional evidence that Plaintiff sought treatment for his mental impairments. Moreover, the record is replete with evidence never acknowledged by the ALJ that Dr. Lin treated Plaintiff for anxiety with Buspar and Zoloft from at least fall 2008 through summer 2010. (R. 501-505, 512-513, 518-519, 522-523, 529-534, 559-560, 622-623). Furthermore, the ALJ failed to consider Plaintiff's testimony that he cannot afford to see a mental health specialist on a regular basis due to lack of insurance (R. 40), which may also bear on the volume of treatment records concerning his mental impairments. *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008) (rejecting negative credibility inference due to lack of treatment in part because ALJ failed to consider Plaintiff's testimony about his inability to pay for regular treatment).

The second item of evidence the ALJ cites concerning Plaintiff's mental impairments, Exhibit 17-F, is a Psychiatric Report that Dr. Lin prepared for the DDS in April 2010, in which he checked the box indicating that Plaintiff has no "serious limitations" with initiating, sustaining or completing tasks. (R. 555). But this absence of "serious limitations" is not necessarily at odds with Dr. Hermsmeyer's conclusion that Plaintiff has "moderate limitations" with concentration, persistence and pace that limit him to one and two-step tasks. Nor does Dr. Lin's Psychiatric Report offer an opinion on Plaintiff's RFC as it concerns multi-step tasks; Dr. Hermsmeyer's is the only mental RFC assessment in the record. Notably, Dr. Hermsmeyer specified that, in assessing Plaintiff's mental RFC, he considered Dr. Lin's Psychiatric Report, among other medical records, as well as an interview of Plaintiff. (R. 574, 578). In any event, the ALJ engaged in no discussion or analysis of how and why she believes that Plaintiff's family physician's opinion about Plaintiff limitations contradicts, or is a basis to reject, the state agency psychologist's assessment of Plaintiff's limitations and corresponding functional capacity.

As noted previously, the ALJ must "build an accurate and logical bridge from the evidence to the conclusion." *See Berger*, 516 F.3d at 544; *see also* 42 U.S.C. § 405(b)(1) (denial of benefits must contain a discussion of the evidence and a statement of the Commissioner's reasons). The ALJ failed to give a well-supported justification for declining to give controlling weight to the state agency psychologist's Mental RFC Assessment. Nor did she identify other medical source opinions or objective medical evidence in the record that support her contrary RFC determination. Accordingly, the RFC is not supported by substantial evidence.

### 3.    The Credibility Assessment

Finally, the Court turns to Plaintiff's challenge to the ALJ's credibility finding. Plaintiff argues that in finding him not credible the ALJ selectively considered evidence of his pain, improperly relied on his daily activities, and failed to consider his work history and favorable evidence from his girlfriend and the state agency physician.

In assessing a claimant's credibility when the allegedly disabling symptoms, such as pain, are not objectively verifiable, an ALJ must first determine whether those symptoms are supported by medical evidence. *See* SSR 96-7p, 1996 WL 374186, at *2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007).  If not, SSR 96-7p requires the ALJ to "consider the entire case record and give specific reasons for the weight given to the individual's statements."  *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (quoting SSR 96-7p).  The ALJ "should look to a number of factors to determine credibility, such as the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and 'functional limitations.'"  *Simila*, 573 F.3d at 517 (quoting 20 C.F.R. § 404.1529(c)(2)-(4)).  Hearing officers are in the best position to evaluate a witness's credibility and their assessment will be reversed only if "patently wrong."  *Schaaf*, 602 F.3d at 875; *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010).  Still, an ALJ must connect her credibility determinations by an "'accurate and logical bridge'" to the record evidence. *Castile*, 617 F.3d at 929 (quoting *Shramek*, 226 F.3d at 811).

The ALJ's credibility determination must be reconsidered given that, as discussed previously, the ALJ improperly failed to give significant weight to Dr. Oken, Plaintiff's treating physician and primary pain management doctor.  Dr. Oken is a

significant source of medical evidence that corroborates Plaintiff's testimony concerning the nature and severity of his debilitating pain. However, because of what the ALJ called a "special relationship" between Dr. Oken and Plaintiff (based on Plaintiff's "appearance" on the Marianjoy website), the ALJ not only declined to give significant weight to Dr. Oken's opinion, but also found Plaintiff not credible. (R. 23). The first step in the credibility analysis is determining whether the Plaintiff's pain symptoms are supported by medical evidence. *See* SSR 96-7p, 1996 WL 374186, at *2. But it cannot be said that the ALJ properly performed this analysis given the lack of significant weight given to the opinion of the physician primarily responsible for assessing and treating Plaintiff's pain over the course of an extended period of time. Also as noted above, the ALJ improperly rejected the opinion of Dr. Hermsmeyer, the state agency psychologist, concerning the symptoms of Plaintiff's mental impairments, at least in part, by imposing a less restrictive RFC limitation without explaining the basis for doing so. Accordingly, to the extent that the ALJ found Plaintiff not credible concerning his mental impairments – and it is not clear from the opinion whether this is the case – then the ALJ should reconsider Plaintiff's credibility as to the nature and severity of those impairments in light of Dr. Hermsmeyer's opinion.

Plaintiff also contends that the ALJ erred in finding his complaints of pain not credible based on his daily activities. While an ALJ may consider a Plaintiff's daily activities when assessing his alleged symptoms, *see* 20 C.F.R. § 404.1529, the Seventh Circuit has repeatedly "cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." *Craft*, 539 F.3d at 680 (quoting *Mendez v.*

*Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006)); *see also Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009). Thus, the ALJ "cannot consider a claimant's household activities but ignore the limitations the claimant faces in performing them." *Zenka v. Astrue*, No. 11 C 7039, 2012 WL 5613646, *11-12 (N.D. Ill. Nov. 15, 2012) (citing *Moss*, 555 F.3d at 562). Here, the ALJ found Plaintiff not credible because in applying for benefits, "he completed an Agency form in which he indicated that despite his alleged disability, he could do household chores, drive occasionally, use public transportation and go shopping. (R. 23). Yet the ALJ failed to discuss Plaintiff's testimony at the hearing concerning his difficulty performing those tasks, including that he has only two or three "good days" per month (R. 40-41, 51); he has numbness in his dominant hand and has difficulty writing and getting dressed (R. 43, 52); he cannot dust, mop, or sweep and takes the garbage out very rarely due to pain and numbness (R. 44, 53), he drives only a couple block to the grocery store once per week and his girlfriend prepares most of his meals (R. 43). The ALJ also relied on a doctor's progress note indicating that Plaintiff had performed intermittent carpentry work since his alleged onset date, but ignored Plaintiff's testimony that this was an error, as well as ignoring the testimony of Plaintiff's live-in girlfriend corroborating that he has not performed any carpentry work. (R. 38, 50, 62).

The ALJ raises other valid concerns about Plaintiff's credibility, such as that he testified he intends to take computer classes despite claiming to have poor hand coordination, and that he sat for 15 minutes at the hearing before his attorney suggested he stand despite claiming he can only sit for 30 seconds. (R. 24). But the ALJ's other questionable grounds for finding Plaintiff not credible, combined with her

improper denial of significant weight to Dr. Oken's and Dr. Hermsmeyer's opinions, renders the credibility assessment as a whole lacking in significant evidentiary support. Accordingly, the ALJ must reconsider the credibility determination on remand.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 15] is granted and Defendant's Motion for Summary Judgment [Doc. 17] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated: February 5, 2013

_____

SHEILA FINNEGAN
United States Magistrate Judge